**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. PAUL P. McDERMOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 05-CV-0147-GC |
| | ) | |
| GENENTECH, INC. and | ) | |
| BIOGEN-IDEC, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ANSWER OF GENENTECH, INC. TO RELATOR'S CORRECTED SECOND
AMENDED COMPLAINT**

Defendant Genentech, Inc. ("Genentech"), by and through its attorneys, hereby

answers the Relator's Corrected Second Amended Complaint as follows:

1.      In response to the allegations in Paragraph 1 of Relator's Second Amended

Complaint (hereinafter Paragraph __), Genentech admits that it employed Relator Paul

McDermott ("Relator") for approximately one year prior to April 29, 2005.  Genentech further

states that while Relator's home office was located in Falmouth, Maine during his employment

by Genentech, Relator was responsible for the Northeast territory, including Maine, New

Hampshire, Vermont, Rhode Island, Connecticut, Massachusetts, New York, and New Jersey.

Genentech lacks sufficient knowledge or information to respond to the remaining allegations in

Paragraph 1, and therefore denies those allegations.

2.      In response to the allegations in Paragraph 2, Genentech admits that it is a

Delaware corporation with its principal place of business in South San Francisco, California.

Genentech states that it is a leading biotherapeutics company, using human genetic information

to discover, develop, commercialize and manufacture medicines that address significant unmet medical needs.  Genentech further states that one of its products on the market is Rituxan, a therapeutic antibody approved with a labeled indication for the treatment of certain forms of cancer and rheumatoid arthritis.

3.      In response to the allegations in Paragraph 3, Genentech states that it co-developed Rituxan with Biogen-Idec, Inc.  Genentech is without information sufficient to respond to the remaining allegations in Paragraph 3, which are directed at Biogen, and therefore denies those allegations.

4.      In response to the allegations in Paragraph 4, Genentech denies that this Court has subject matter jurisdiction over Counts I and II of the Corrected Second Amended Complaint. Those counts are barred by 31 U.S.C. § 3730(e)(3) because they are based upon allegations that are the subject of a pre-existing and ongoing investigation by the United States.  Counts I and II are further barred by 31 U.S.C. § 3730(e)(4) because the allegations supporting those Counts are based upon publicly disclosed information.  Genentech further denies that the Relator is an original source of the information on which Counts I and II are based.  Genentech admits that this Court has subject matter jurisdiction over Counts III and IV of the Corrected Second Amended Complaint.

5.      Genentech admits the allegations in Paragraph 5.

6.      In response to the allegations in Paragraph 6, Genentech admits that on April 19, 2007, the MHRC issued a letter stating that it had determined that reasonable grounds exist to believe that unlawful discrimination occurred.  Genentech admits that a copy of that letter is

attached to the Corrected Second Amended Complaint as Exhibit 2.  Genentech denies that it discriminated against Relator.

Genentech further states that the determination of the MHRC is directly contrary to the findings of fact made by its Chief Investigator, Brenda E. Haskell, and communicated to the MHRC by her on March 13, 2007.  Investigator Haskell considered extensive facts presented by Relator and Genentech through lengthy written submissions, including exhibits, and through the testimony of five witnesses with personal knowledge of the facts surrounding Relator's separation from Genentech.  Investigator Haskell found that "credibility issues" existed with respect to Relator, caused at least in part by the "significant differences" between the charges filed by Relator and the Relator's subsequent testimony.  Ultimately, Investigator Haskell concluded that "there is no evidence that [Relator] was perceived to be a whistleblower," and "that there are no reasonable grounds to believe that Mr. Paul McDermott was unlawfully discriminated against in employment (discharge) on the basis of whistleblower activity by officials of Genentech, Inc."  Thus, Investigator Haskell recommended that Relator's Complaint be dismissed by the MHRC.  Genentech states that the MHRC has not articulated any basis for rejecting Investigator Haskell's findings and recommendations, or any rationale for its Statement of Finding.  Genentech further denies that any "reasonable grounds" exist to believe that Genentech unlawfully discriminated against Relator.

7.      In response to the allegations in Paragraph 7, Genentech admits that on April 24, 2007, the MHRC issued a letter to counsel for Relator stating that conciliation efforts had failed to resolve Relator's MHRC action against Genentech.  Genentech admits that a copy of that letter is attached to the Corrected Second Amended Complaint as Exhibit 3.

8.      In response to the allegations in Paragraph 8, Genentech admits that it co-developed Rituxan with Biogen-Idec, Inc.

9.      In response to the allegations in Paragraph 9, Genentech states that Biogen-Idec and Genentech cross-license certain rights to develop, manufacture, and sell Rituxan.

10.     In response to the allegations in Paragraph 10, Genentech states that during the time period relevant to this action – the period of Relator's employment by Genentech – it had marketing and sales teams that supported Rituxan.  Genentech denies that Relator was ever employed in either capacity.

11.     Genentech states that the allegations in Paragraph 11 are directed at Biogen, not Genentech, and Genentech therefore denies those allegations.

12.     Genentech admits the allegations in Paragraph 12.

13.     In response to the allegations in Paragraph 13, Genentech states that certain FDA regulations apply to the manufacture, advertising, and labeling of biologics such as Rituxan. Genentech further states that FDA regulations do not restrict physicians' rights to purchase and prescribe biologics such as Rituxan for any medically-indicated purpose.  Genentech denies any remaining allegations in Paragraph 13.

14.     In response to the allegations in Paragraph 14, Genentech states that Rituxan is a biologic medicine that works by binding to a protein (the CD20 antigen) on the surface of normal and malignant white cells known as B cells.  B-cells play an important role in both non-Hodgkin's lymphoma ("NHL") and rheumatoid arthritis ("RA").  Rituxan recruits the body's natural defenses to attack and kill the "marked" B-cells, allowing healthy B-cells to regenerate in

their place.  Genentech further states that Rituxan was approved by the U.S. Food and Drug Administration ("FDA") in November 1997 as the first therapeutic antibody with an approved indication to treat cancer in the United States.  Currently, Rituxan's FDA-approved label includes indications for use in adults alone or with other anti-cancer medicines to treat certain types of NHL.  In addition, Genentech states that in February 2006, the FDA approved a labeled indication for Rituxan in combination with methotrexate for the treatment of moderately- to severely-active RA in patients who have had an inadequate response to one or more tumor necrosis factor ("TNF") antagonist therapies.  Genentech denies the remaining allegations in Paragraph 14.

15.      In response to the allegations in Paragraph 15, Genentech states that the FDA approved Rituxan in November 1997 with a labeled indication for the treatment of patients with relapsed or refractory, low-grade or follicular, CD20-positive, B-cell NHL.  At that time, the recommended dosage of Rituxan was 375 mg/m$^2$ administered as an IV infusion once weekly for four doses.  Genentech further states that in April 2001, the FDA approved Rituxan for several new indications, including:  the retreatment of patients with Rituxan who have relapsed following initial Rituxan therapy; the recommended use of eight weekly doses (compared to four) per course of treatment; and the treatment of patients with "bulky disease" (lesions > 10 cm).  Genentech states that in September 2006, the FDA approved Rituxan for additional indications in first-line treatment of diffuse large B-cell, CD20-positive, non-Hodgkin's lymphoma in combination with CHOP or other anthracycline-based chemotherapy regimens.  Finally, Genentech states that in February 2006, the FDA approved Rituxan with a labeled indication for use in combination with methotrexate for the treatment of moderately- to severely-

active RA in patients who have had an inadequate response to one or more tumor necrosis factor ("TNF") antagonist therapies.  Genentech denies the remaining allegations in Paragraph 15.

16.      In response to the allegations in Paragraph 16, Genentech incorporates by reference its response to Paragraph 15.  Genentech denies any remaining allegations in Paragraph 16.

17.      In response to the allegations in Paragraph 17, Genentech states that physicians make independent decisions regarding which pharmaceutical and biologic products they prescribe.  Genentech is without knowledge regarding the actual reasons underlying those individual prescribing decisions.  Genentech therefore denies the allegations in Paragraph 17.

18.      Genentech denies the allegations in Paragraph 18.  Genentech further states that it does not submit any claims to Medicare or Medicaid for any product, including Rituxan.

19.      In response to the allegations in Paragraph 19, Genentech incorporates by reference its responses to all preceding Paragraphs.  To the extent a further response is required, Genentech denies the allegations in Paragraph 19.

20.      In response to the allegations in Paragraph 20, Genentech states that the information required to obtain payment from the Medicare and Medicaid programs is set forth in the Social Security Act, the implementing regulations, the Medicare and Medicaid Benefit Policy Manuals, and other guidance issued by the Centers for Medicare and Medicaid Services ("CMS") and Medicare and Medicaid carriers.  To the extent Paragraph 20 sets forth any legal conclusions regarding those requirements, no response is required.  To the extent a further response is required, Genentech denies the allegations of Paragraph 20.

21.     In response to the allegations in Paragraph 21, Genentech states that in order to receive Medicare or Medicaid reimbursement for physician-administered biologics, such as Rituxan, the administering physician must submit a claim on the standard CMS-1500 claim form.  Genentech further states that the laws and regulations that govern the federal government's payment of Medicare and Medicaid claims are set forth in the Social Security Act, the implementing regulations, the Medicare and Medicaid Benefit Policy Manuals, and other guidance issued by the Centers for Medicare and Medicaid Services ("CMS") and Medicare and Medicaid carriers.  To the extent Paragraph 21 sets forth any legal conclusions regarding those requirements, no response is required.  To the extent a further response is required, Genentech denies the allegations in Paragraph 21.

22.     In response to the allegations in Paragraph 22, Genentech admits that the CMS-1500 claim form requires a physician to certify "that the services listed [on the form] were medically indicated and necessary to the health of [the] patient and were personally furnished by me or my employee under my personal direction."  Genentech denies any other allegations in Paragraph 22.

23.     In response to the allegations in Paragraph 23, Genentech incorporates by reference its response to Paragraph 22.  Genentech denies any other allegations of Paragraph 23.

24.     In response to the allegations in Paragraph 24, Genentech incorporates by reference its response to Paragraph 22.  Genentech further states that the laws and regulations that govern eligibility for government reimbursement of Medicare and Medicaid claims are set

forth in the Social Security Act, the implementing regulations, the Medicare and Medicaid

Benefit Policy Manuals, and other guidance issued by the Centers for Medicare and Medicaid

Services ("CMS") and Medicare and Medicaid carriers.  To the extent Paragraph 24 sets forth

any legal conclusions regarding those requirements, no response is required.  To the extent a

further response is required, Genentech denies the allegations of Paragraph 24.

25.     In response to the allegations in Paragraph 25, Genentech states that federal law

requires Medicare carriers to determine whether to reimburse providers for particular uses of

drugs and biologics based on several factors, including whether the use is listed in medical

compendia, and whether the particular hospital in which the drug was prescribed has approved

the drug for that use.  *See* 42 U.S.C. § 1395x(t)(1).  Thus, CMS has instructed Medicare carriers

that "FDA approved drugs used for indications other than what is indicated on the official label

may be covered under Medicare if the carrier determines the use to be medically accepted, taking

into consideration the major drug compendia, authoritative medical literature and/or accepted

standards of medical practice."  *See* Medicare Benefit Policy Manual 50.4.2 – Unlabeled Use of

Drug.

Genentech further states that the Social Security Act authorizes Medicaid programs to

cover all "prescribed drugs."  *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(12); 42 C.F.R. §

440.120(a).  The Act further instructs States that accept federal funds for Medicaid programs to

reimburse for the use of prescription drugs and biologics for any "medically accepted

indication," which specifically includes off-label uses that are "included or approved for

inclusion" in certain compendia.  *See* 42 U.S.C. § 1396r-8(k)(6).

Genentech denies any other allegations in Paragraph 25.

26.     In response to the allegations in Paragraph 26, Genentech incorporates by reference its response to Paragraph 25.  Genentech denies any remaining allegations in Paragraph 26.

27.     In response to the allegations in Paragraph 27, Genentech incorporates by reference its response to Paragraph 25.  To the extent a further response is required, Genentech denies any remaining allegations in Paragraph 27.

28.     Genentech denies the allegations in Paragraph 28.  Answering further, Genentech states that there is nothing "illegal" about a physician or hospital submitting a claim for reimbursement to Medicare or Medicaid for a drug or biologic for a use that is not included in the FDA-approved label for that product.

29.     Genentech denies the allegations in Paragraph 29.  Answering further, Genentech incorporates by reference its response to Paragraph 15.  Answering further, Genentech states that during the period of time relevant to this action, Rituxan was a medically accepted treatment for RA.  For example, Genentech states that at least one of the compendia recognized by the Medicare and Medicaid programs, the DRUGDEX information system, identified Rituxan as a medically recognized treatment for RA for at least some period before the FDA approved an indication for that use.

30.     Genentech is without information or knowledge to respond to the allegations in Paragraph 30, and therefore denies those allegations.

31.     In response to the allegations in Paragraph 31, Genentech admits that physicians may prescribe drugs or biologics for indications or in dosages other than those approved by the

FDA.  Genentech states that the remaining allegations state a legal conclusion to which no response is required.  To the extent a response is required, Genentech denies those allegations.

32.     Genentech denies the allegations in Paragraph 32.  Answering further, Genentech states that prescribing a drug for an "off-label" use does not render a claim for payment for that drug "ineligible for payment" by Medicare or Medicaid.

33.     Genentech denies the allegations in Paragraph 33.  Answering further, Genentech states that prescribing a drug for an "off-label" use does not render a claim for payment for that drug "ineligible for payment" by Medicare or Medicaid.

34.     Genentech denies the allegations in Paragraph 34.  Answering further, Genentech states that prescribing a drug for an "off-label" use does not render a claim for payment for that drug "ineligible for payment" by Medicare or Medicaid.

35.     Genentech denies the allegations in Paragraph 35.  Answering further, Genentech states that prescribing a drug for an "off-label" use does not render a claim for payment for that drug "ineligible for payment" by Medicare or Medicaid.

36.     Genentech denies the allegations in Paragraph 36.  Answering further, Genentech states that prescribing a drug for an "off-label" use does not render a claim for payment for that drug fraudulent or "ineligible for payment" by Medicare or Medicaid.

37.     In response to the allegations in Paragraph 37, Genentech states that it takes seriously any issue, complaint or concern about a suspected breach in ethics, compliance requirements, or company policy, including, but not limited to, those related to "off-label"

promotion.  Genentech is without knowledge or information sufficient to respond to the remaining allegations in Paragraph 37, and therefore denies those allegations.

38.     In response to the allegations in Paragraph 38, Genentech incorporates by reference its responses to Paragraphs 27-34.  To the extent a further response to the allegations in Paragraph 38 is required, Genentech denies those allegations.

39.     Genentech denies the allegations in Paragraph 39, to the extent they apply to it. Genentech is without information sufficient to respond to the remaining allegations in Paragraph 39, and therefore denies those allegations.

40.     Genentech denies the allegations in Paragraph 40 to the extent they apply to it. Answering further, Genentech states that prescribing a drug for an "off-label" use does not render a claim for payment for that drug "ineligible for payment" by Medicare or Medicaid.

41.     In response to the allegations in Paragraph 41, Genentech states that following the FDA's approval of Rituxan in 1997 for the treatment of certain types of NHL, Rituxan's effectiveness led researchers to study its ability to treat other medical conditions in which B-cells play a role.  Genentech states that one of those uses is RA.  RA is a systemic debilitating autoimmune disease that occurs when the immune system inappropriately attacks joint tissue, causing painful chronic inflammation and irreversible destruction of cartilage, tendons and bones, that often results in chronic pain, and loss of function and disability.  RA affects more than two million Americans.  Genentech states that by 1999, an exploratory clinical trial had shown that Rituxan was effective in relieving symptoms in patients with RA who had failed to respond to existing therapies.  Further, larger clinical trials subsequently demonstrated that Rituxan led to statistically significant improvement in disease symptoms for RA patients.

Genentech states that, encouraged by these results, it pursued its own research into Rituxan's effectiveness at treating RA. Genentech conducted Phase IIb and Phase III clinical trials, which demonstrated that Rituxan was effective at treating RA patients who had not responded to traditional treatments. Based on the clinical data and Rituxan's proven safety, Genentech states that on October 31, 2005, it and Biogen-Idec applied to the FDA for a supplemental Biologics License under Priority Review to allow them to modify Rituxan's label to list RA as an indicated use. Genentech states that the FDA issued its approval of that application on February 28, 2006.

42.     In response to the allegations in Paragraph 42, Genentech states that on February 28, 2006, the FDA approved Genentech's supplemental biologics license application for a new labeled indication for use of Rituxan in combination with methotrexate for the treatment of moderately- to severely-active RA in patients who have had an inadequate response to one or more tumor necrosis factor ("TNF") antagonist therapies.

43.     Genentech denies the allegations in Paragraph 43.

44.     Genentech is without information sufficient to respond to the allegations in Paragraph 44 directed at Biogen, and therefore denies those allegations. Genentech denies the allegations in Paragraph 44 to the extent they are directed at Genentech.

45.     Genentech denies the allegations in Paragraph 45. Genentech states that Relator was informed by the supervisor of a Rituxan sales representative that the sales representative had reported being contacted by a rheumatologist's office that was seeking information on the proper administration of Rituxan. Genentech denies that any illegal conduct occurred at that time, and further denies that Relator reported to Genentech any illegal conduct. Genentech states that on

February 2, 2005, Relator asked Martin Babler, Genentech's Vice President, Immunology Sales and Marketing, who should respond to such inquiries when they arise. Genentech states that on February 8, 2005, Genentech issued an e-mail to relevant employees instructing them on the proper referral of unsolicited requests for information related to the administration of Rituxan or for "off-label" information. Genentech further states that this e-mail specifically instructed that "this e-mail and referral system is NOT meant to encourage or direct . . . contact or call upon rheumatologists. The objective of this communication is to clarify how best to handle those unsolicited requests."

46.    In response to the allegations in Paragraph 46, Genentech admits that during the time period relevant to this matter, Genentech did not market any drugs or biologics that were approved by the FDA for the treatment of RA. Genentech denies the remaining allegations in Paragraph 46.

47.    Genentech denies the allegations in Paragraph 47 to the extent they pertain to Genentech. Genentech states that in 2004 it hired five individuals, including Relator, to be Professional Education Liaisons ("PEL's"). Genentech states that during the relevant time period PELs were responsible for developing relationships with rheumatologists within their respective regions in anticipation of the FDA's approval of Rituxan to treat RA. Genentech denies that PELs were ever asked to promote Rituxan for any "off-label" use, including for RA. Genentech further states that Relator has admitted in testimony before the MHRC that he was never asked by Genentech to advocate any "off-label" use of Rituxan.

48.     Genentech is without information sufficient to respond to the allegations in Paragraph 48 directed at Biogen, and therefore denies those allegations.  Genentech denies the allegations in Paragraph 48 relating to Genentech.

49.     Genentech states that one of the responsibilities of PELs during the relevant time period was to identify regional Thought Leaders.  Genentech states that, where appropriate, Thought Leaders were invited to enter into consulting agreements with Genentech to serve as advisors, investigators, or speakers.  Genentech denies the remaining allegations in Paragraph 49 to the extent they apply to it.

50.     In response to the allegations in Paragraph 50, Genentech states that Dr. Eric Ruderman, Dr. Joseph Markenson, Dr. Alan Gibofsky and Dr. Marc Cohen had consulting agreements with Genentech during at least some of the relevant time period.

51.     Genentech denies the allegations in Paragraph 51.

52.     Genentech denies the allegations in Paragraph 52.

53.     Genentech denies the allegations in Paragraph 53.

54.     Genentech denies the allegations in Paragraph 54.  Answering further, Genentech states that it has sponsored legitimate medical education events in the form of roundtable dinners addressing immunology and the role of B-cells in RA.  Genentech states that it entered into consulting agreements with rheumatologist Thought Leaders to serve as moderators of these disease state educational programs, pursuant to which the Thought Leaders were paid appropriate honoraria.  Genentech denies that the disease state educational programs were designed to be promotional or to discuss Rituxan or any specific B-cell therapies.  Genentech

states that it provided the moderators with slide presentations for use during the roundtable events that did not include any mention of Rituxan or any other Genentech product, and provided the moderators with appropriate compliance guidance.

55.     In response to the allegations in Paragraph 55, Genentech admits that it contracted with Health Answers Education, an independent medical education vendor, to administer the immunology disease state roundtable programs.  Genentech states that Health Answers Education worked with the PELs to identify physicians to invite to the programs.  Genentech further states that Health Answers Education and, in some instances, the physicians selected to moderate the immunology disease state roundtable programs issued invitations for the programs.  Genentech denies the remaining allegations in Paragraph 55.

56.     In response to the allegations in Paragraph 56, Genentech states on information and belief that Health Answers Education maintained a password-protected website at www.raroundtables.com during the relevant time period, on which certain information related to the immunology disease state roundtable programs was available.  Genentech denies the remaining allegations in Paragraph 56.

57.     In response to the allegations in Paragraph 57, Genentech incorporates by reference its responses to Paragraphs 54-55.  Genentech admits that the slide presentation it provided to moderators for use during at least some roundtable events was entitled "Pathogenesis of Rheumatoid Arthritis:  An in-depth look at B cells."  Genentech further states that the immunology disease state roundtable dinners were typically held at local restaurants or dining facilities.  Genentech states that the immunology disease state roundtable dinners were typically attended by five to ten health care providers.  Genentech states that PELs were authorized to

attend the immunology disease state roundtable dinners.  Genentech is without information sufficient to respond to the remaining allegations in Paragraph 57, and therefore denies those allegations.

58.      Genentech denies each of the allegations in Paragraph 58.  Answering further, Genentech states that Relator never communicated any objection to any "RA Roundtable," at any time to any of his supervisors at Genentech.

59.      Genentech denies each of the allegations in Paragraph 59.  Answering further, Genentech states that Relator never communicated any objection to any "RA Roundtable," at any time to any of his supervisors at Genentech.

60.      In response to the allegations in Paragraph 60, Genentech states that it was disclosed at immunology disease state roundtable dinners that Genentech was providing financial support for the educational programs.  Genentech further states that it provided moderators with slide presentations for use during the roundtable dinners.  Genentech states that it provided moderators with disease state slide presentations in order to ensure that the moderators did not present information regarding the "off-label" use of any product to treat B-cell diseases, including, but not limited to, Rituxan.  Genentech also states that Dr. Alvin Wells and Dr. Gregg Silverman provided input to the content of the slide presentation provided to moderators of the RA Roundtable dinners, along with review and additional information provided by Genentech and Health Answers Education.  Genentech is without information sufficient to respond to the allegations in Paragraph 60 directed at Biogen, and therefore denies those allegations. Genentech denies the remaining allegations in Paragraph 60.

61.     In response to the allegations in Paragraph 61, Genentech denies that the RA Roundtable dinners addressing immunology and the role of B-cells were not fair and balanced. Genentech states that at this time, on information and belief, it believes that Dr. Lally chose not to moderate an RA Roundtable dinner.  Genentech states that it is without information or knowledge at this time as to Dr. Lally's actual reason, if any, for deciding not to moderate an RA Roundtable dinner.  Genentech denies the remaining allegations in Paragraph 61.

62.     In response to the allegations in Paragraph 62, Genentech states that it is without knowledge as to Dr. Lally's actual reason, if any, for deciding not to moderate an RA Roundtable dinner, and therefore denies the first allegation in Paragraph 62.  Genentech is without information sufficient to respond to the allegations in Paragraph 62 directed at Biogen, and therefore denies those allegations.  Genentech denies the remaining allegations in Paragraph 62.

63.     In response to the allegations in Paragraph 63, Genentech states that from time to time it enters into consulting agreements with physicians or other health care providers to participate in Advisory Board meetings.  Genentech invites consultants at Advisory Board meetings to advise the company on therapeutic areas relevant to its products, and to provide guidance on general medical and business issues related to its products.  Genentech states that it relies on guidance provided by Advisory Boards for legitimate business purposes.  Genentech further states that it has conducted Regional Advisory Board meetings to obtain guidance from rheumatologists regarding medical and business issues related to Rituxan.  Genentech denies that it conducted Advisory Boards as part of a "scheme to promote off-label uses of Rituxan." Genentech denies the remaining allegations in Paragraph 63 to the extent they apply to it.

64.     In response to the allegations in Paragraph 64, Genentech incorporates by reference its response to Paragraph 63.  Genentech denies that it "leveraged 'consulting' rheumatologists under contract to promote off-label use of Rituxan to treat RA."  Genentech states that because it relies on Advisory Boards to obtain guidance on specific medical and business issues related to its products, it does prepare and distribute agendas to be followed by each Advisory Board.  Genentech denies the remaining allegations in Paragraph 64 to the extent they apply to it.

65.     In response to the allegations in Paragraph 65, Genentech incorporates by reference its responses to Paragraphs 63-64.  Genentech denies that it "used [Advisory Board] meetings to promote Rituxan's off-label use to treat RA and to disseminate data to generate off-label Rituxan use in treating RA."  Genentech states that because the purpose of Advisory Board meetings is for the company to obtain advice on medical and business issues related to its products, company employees, including, but not limited to, marketing employees, attend Advisory Board meetings.  Genentech further states that, from time to time, company employees presented specific information or data to Advisory Boards in order to obtain such advice.  Genentech denies the remaining allegations in Paragraph 65 to the extent they apply to it.

66.     In response to the allegations in Paragraph 66, Genentech states that one of the responsibilities of its PELs during the relevant time period was to assist the company in identifying physicians who had an interest in authoring clinical papers regarding therapeutic areas relevant to the company.  Genentech states that from time to time it provided financial support for clinical research and publication projects, in compliance with applicable laws and regulations.  Genentech denies that Relator communicated any objection to contacting any rheumatologist or any objection to Genentech's sponsorship of clinical research and publications

at any time to any of his supervisors at Genentech.  Genentech denies the remaining allegations in Paragraph 66 to the extent they apply to it.

67.     In response to the allegations in Paragraph 67, Genentech incorporates by reference its response to the allegations in Paragraph 66.  Genentech denies that it sponsored any published clinical paper authored by Dr. Jonathan Kay, Dr. Alna Kaell, or Dr. Gregory Rihaceck during the relevant time period.  Genentech further states that despite its diligent efforts and investigation to date, it is without knowledge or information sufficient to confirm or deny whether Relator was "assigned" to "recruit" the physicians listed in Paragraph 67 to author articles on Rituxan, and therefore denies those allegations.  Genentech states that Relator never communicated any objection to Genentech's sponsorship of clinical research and publications at any time to any of his supervisors at Genentech.  Genentech denies the remaining allegations in Paragraph 67 to the extent they apply to it.

68.     Genentech denies the allegations in Paragraph 68.  Answering further, Genentech incorporates by reference its response to the allegations in Paragraph 45.

69.     In response to the allegations in Paragraph 69, Genentech states that the job title for the position Relator was hired to fill was "Professional Education Liaison – Rheumatology." Answering further, Genentech incorporates by reference its response to the allegations in Paragraph 47.  Genentech acknowledges that it initially provided Relator with business cards that mistakenly listed his job title as "Professional Education Liaison - Rituxan RA."  Genentech states that these business cards were prepared by an administrative assistant.  Genentech further states that when it became aware of the mistake, it promptly provided Relator with business cards that did not include the designation "Rituxan RA."  Genentech denies that it engaged in the

alleged "off-label sales or marketing activities regarding the use of Rituxan in treating RA." Genentech further denies that Relator's job responsibilities included any "off-label sales or marketing activities regarding the use of Rituxan."  In fact, Genentech states that Relator admitted during testimony to the MHRC fact-finder that he was never asked to advocate off-label use of Rituxan.  Genentech also states that Relator never communicated any objection to his job responsibilities or to the job description initially listed on his business cards at any time to any of his supervisors at Genentech.  Genentech denies the remaining allegations in Paragraph 69.

70.     In response to the allegations in Paragraph 70, Genentech states that it is without information or knowledge at this time regarding whether Relator was asked to attend or did attend the meeting described in Paragraph 70, and therefore denies those allegations.  Genentech admits that Douglas Love, then an attorney in Genentech's legal department, participated in a meeting at Genentech's headquarters in South San Francisco in November, 2004.  Genentech denies that anything inappropriate was communicated at that meeting.  Genentech states that the attorney-client privilege protects from disclosure the substance of any communications that were made at that meeting and that Genentech does not waive that privilege.  Genentech further states that Relator never communicated any objection to anything that was communicated at that meeting at any time to any of his supervisors at Genentech.

71.     In response to the allegations in Paragraph 71, Genentech incorporates by reference its responses to Paragraph 70.

72.     In response to the allegations in Paragraph 72, Genentech incorporates by reference its responses to Paragraph 70.

73.     In response to the allegations in Paragraph 73, Genentech incorporates by reference its response to Paragraph 70.

74.     Genentech denies the allegations in Paragraph 74.

75.     In response to the allegations in Paragraph 75, Genentech incorporates by reference its response to the allegations in Paragraph 15.  Genentech is without information sufficient to respond to the allegations in Paragraph 75 directed at Biogen, and therefore denies those allegations.  Genentech denies the remaining allegations in Paragraph 75.

76.     Genentech denies the allegations in Paragraph 76.

77.     Genentech denies the allegations in Paragraph 77.

78.     In response to the allegations in Paragraph 78, Genentech states that during the period of time relevant to this action, the wholesale price published by Genentech for one 1000mg dose of Rituxan was $4,220.04.  Genentech denies all other allegations in Paragraph 78 to the extent they apply to it.

79.     In response to the allegations in Paragraph 79, Genentech incorporates by reference its response to the allegations in Paragraph 17.  Genentech denies the remaining allegations in Paragraph 79.

80.     Genentech denies the allegations in Paragraph 80.  Answering further, Genentech states that Relator never raised any issue, complaint or concern with any of his supervisors at Genentech that he had been instructed "to counsel rheumatologists how they should discuss with

their Medicare patients afflicted with RA the financial ramifications of commencing Rituxan treatment."

81.     Genentech denies the allegations in Paragraph 81.  Answering further, Genentech states that Relator never raised any issue, complaint or concern with any of his supervisors at Genentech that he had been instructed "to counsel rheumatologists that the Medicare co-payments (20%) are higher than those of many private insurers and about the difficulties such patients might have making the co- payments because of the high cost of Rituxan per treatment compared to their prior medications."

82.     Genentech denies the allegations in Paragraph 82.

83.     Genentech denies the allegations in Paragraph 83.

84.     In response to the allegations in Paragraph 84, Genentech states that total annual sales of Rituxan in the United States in 2000 were approximately $425 million.  Genentech further states that total annual sales of Rituxan in the United States in 2004 were approximately $1.574 billion.  Genentech denies any remaining allegations in Paragraph 84, to the extent they apply to it.

85.     Genentech is without information to determine the specific amount of sales that are attributable to the use of Rituxan for RA, and denies the allegations in Paragraph 85.

86.     Genentech denies the allegations in Paragraph 86.

87.     Genentech denies the allegations in Paragraph 87.

88.     Genentech denies the allegations in Paragraph 88.  Answering further, Genentech states that Relator was never employed by Genentech as a "sales representative."  Genentech further states that it did not "train[] its sales representatives [or] Relator McDermott [or other PELs] to counsel rheumatologists how they should discuss with their Medicare patients afflicted with RA the financial ramifications of commencing Rituxan treatment."  Genentech also states that Relator never raised any issue, complaint or concern with any of his supervisors at Genentech that he had been "trained . . . to counsel rheumatologists how they should discuss with their Medicare patients afflicted with RA the financial ramifications of commencing Rituxan treatment."

89.     Genentech denies the allegations in Paragraph 89.

90.     Genentech denies the allegations in Paragraph 90.

91.     Genentech denies the allegations in Paragraph 91.  Answering further, Genentech incorporates by reference its responses to the allegations in Paragraphs 20-21, and 25-29.

92.     Genentech denies the allegations in Paragraph 92.  Genentech incorporates by reference its responses to the allegations in Paragraphs 20-29.

93.     Genentech denies the allegations in Paragraph 93.  Genentech further states that this Court has previously determined that the allegations in Paragraph 93 are false.  *See* Recommended Decision on Motions to Dismiss, Dec. 14, 2006 at 19-20.

94.     In response to the allegations in Paragraph 94, Genentech denies that it promoted the use of Rituxan for the treatment of RA prior to February 28, 2006.

95.     Genentech denies the allegations in Paragraph 95 to the extent they apply to it.

96.     Genentech denies the allegations in Paragraph 96.

97.     Genentech denies the allegations in Paragraph 97.  Genentech further states that the Court has previously rejected the allegations in Paragraph 97.  *See* Recommended Decision on Motions to Dismiss, Dec. 14, 2006 at 19-20; Order Affirming the Recommended Decision of the Magistrate Judge and on Plaintiff's Motion to File Second Amended Complaint, July 24, 2007.

98.     In response to the allegations in Paragraph 98, Genentech states that the Parties have jointly moved to dismiss Count I from the Second Amended Complaint, and thus no response to this Paragraph is necessary.  To the extent a response is required, Genentech incorporates by reference its responses to Paragraphs 1-4 and 8-97.

99.     In response to the allegations in Paragraph 99, Genentech states that the Parties have jointly moved to dismiss Count I from the Second Amended Complaint, and thus no response to this Paragraph is necessary.  To the extent a response is required, Genentech denies the allegations in Paragraph 99.

100.     In response to the allegations in Paragraph 100, Genentech states that the Parties have jointly moved to dismiss Count I from the Second Amended Complaint, and thus no response to this Paragraph is necessary.  To the extent a response is required, Genentech denies the allegations in Paragraph 100.

101.     In response to the allegations in Paragraph 101, Genentech states that the Parties have jointly moved to dismiss Count I from the Second Amended Complaint, and thus no

response to this Paragraph is necessary.  To the extent a response is required, Genentech denies the allegations in Paragraph 101.

102.    In response to the allegations in Paragraph 102, Genentech states that the Parties have jointly moved to dismiss Count I from the Second Amended Complaint, and thus no response to this Paragraph is necessary.  To the extent a response is required, Genentech denies the allegations in Paragraph 102.

103.    In response to the allegations in Paragraph 103, Genentech states that the Parties have jointly moved to dismiss Count I from the Second Amended Complaint, and thus no response to this Paragraph is necessary.  To the extent a response is required, Genentech denies the allegations in Paragraph 103.

104.    In response to the allegations in Paragraph 104, Genentech states that the Parties have jointly moved to dismiss Count II from the Second Amended Complaint, and thus no response to this Paragraph is necessary.  To the extent a response is required, Genentech incorporates by reference its responses to Paragraphs 1-4 and 8-97.

105.    In response to the allegations in Paragraph 105, Genentech states that the Parties have jointly moved to dismiss Count II from the Second Amended Complaint, and thus no response to this Paragraph is necessary.  To the extent a response is required, Genentech denies the allegations in Paragraph 105.

106.    In response to the allegations in Paragraph 106, Genentech states that the Parties have jointly moved to dismiss Count II from the Second Amended Complaint, and thus no

response to this Paragraph is necessary.  To the extent a response is required, Genentech denies the allegations in Paragraph 106.

107.    In response to the allegations in Paragraph 107, Genentech incorporates by reference its responses to Paragraphs 1-4 and 8-106.

108.    In response to the allegations in Paragraph 108, Genentech states that the False Claims Act speaks for itself.  Genentech states that Relator never complained to Robert Rice about any alleged illegal promotion of Rituxan, or about any other alleged illegal activity. Genentech further states that Relator never "questioned Rice what Genentech was going to do about [any alleged illegal activity]."  Genentech admits that during the relevant time period, Robert Rice was based at Genentech's headquarters in South San Francisco, California. However, Genentech states that prior to January 2005, Robert Rice resided in Chicago, Illinois. Genentech denies any other allegations in Paragraph 108.

109.    Genentech denies the allegations in Paragraph 109.

110.    In response to the allegations in Paragraph 110, Genentech states that Relator never complained to Robert Rice about any alleged illegal promotion of Rituxan, or about any other alleged illegal activity.  Genentech denies all remaining allegations in Paragraph 110.

111.    In response to the allegations in Paragraph 111, Genentech incorporates by reference its response to the allegations in Paragraph 45.  Genentech admits that in February 2005 Martin Babler's title was Vice President, Immunology Sales and Marketing.  Genentech states that in February 2005, Martin Babler was responsible for Rituxan Immunology marketing

planning activities.  Genentech further states that in February 2005 Genentech did not have a

Rituxan Immunology sales force.  Genentech denies all remaining allegations in Paragraph 111.

112.    In response to the allegations in Paragraph 112, Genentech incorporates by

reference its responses to the allegations in Paragraph 45.  Genentech states that Martin Babler

advised Relator during the February 2, 2005 conversation that he would look into Relator's

question regarding who at Genentech should respond to unsolicited requests from

rheumatologists for information regarding the administration of Rituxan and would make sure

that appropriate instructions were issued to relevant employees.  Genentech further states that on

February 8, 2005, Genentech issued an e-mail to relevant employees instructing them on the

proper referral of unsolicited requests for information related to the administration of Rituxan or

for "off-label" information.  Genentech denies all remaining allegations in Paragraph 112.

113.    Genentech denies the allegations in Paragraph 113.  Answering further,

Genentech states that Relator never complained to Robert Rice about any alleged illegal

promotion of Rituxan, or about any other alleged illegal activity.  Genentech states that Relator's

testimony during a fact-finding hearing before the MHRC regarding complaints allegedly made

to Rice did not include any mention of alleged complaints to Rice during a telephone

conversation with him on February 23.  Genentech further states that on or around February 24,

2005, Rice met with Relator in Chicago, Illinois.  At this meeting, Relator presented numerous

complaints to Rice, but none of them concerned any alleged illegal promotion or marketing of

Rituxan, or any other illegal activity.  During the meeting, Relator advised Rice that he refused

to work under Rice's supervision any longer.  In response, Rice offered to let Relator take sixty

days to search within the company for another suitable position, with the understanding that if he

could not locate one, he would resign, since he had made it clear that he refused to continue in

his current role.  Relator agreed to Rice's proposal, but demanded a severance package in the event he was unable to find another position within the company within 60 days.  Rice informed Relator that he was not authorized to offer a severance package.

114.    In response to the allegations in Paragraph 114, Genentech admits that on March 4, 2005, Relator participated in a telephone conference call with Fred Logan, Senior Director, and David Hooper, Senior Human Resources Manager.  Answering further, Genentech states that during this telephone call, as an alternative to taking sixty days to find another position at Genentech, Logan offered Relator the option to resign immediately, permitting him to focus his job search elsewhere, and receive two months' pay, equal to $20,833.36.  Relator subsequently declined Logan's offer for two months' pay, and chose to take the sixty days to continue to look for employment within Genentech.  Genentech admits that Relator stated he was interested in obtaining a position with Genentech Managed Care.  However, Relator severely limited his chances of finding any other position at Genentech, by refusing to relocate from Maine. Genentech further states that there was no available Managed Care position in Maine during the time Relator was looking for a position.  Ultimately, Relator was unable to find a position within Genentech that met his geographical and professional requirements.  Genentech denies all remaining allegations in Paragraph 114.

115.    In response to the allegations in Paragraph 115, Genentech states that as a result of Relator's declaration that he refused to continue working in his current role under Robert Rice, and his subsequent failure to find an alternative position within Genentech within the agreed-upon time, Genentech sent him a letter by e-mail on April 29, 2005, based upon the end of his resignation period, terminating his employment.   Genentech denies all remaining allegations in Paragraph 115.

116.     In response to the allegations in Paragraph 116, Genentech admits that it terminated all employment-related benefits to Relator following the confirmation of his resignation on April 29, 2005.

117.     In response to the allegations in Paragraph 117, Genentech admits that Relator sent an e-mail to Genentech in which he denied that he had resigned.  However, Genentech states that this e-mail ignored the fact that McDermott had agreed that he would resign if he could not find an alternate position within sixty days, because he refused to continue working in his current role under Robert Rice.  Genentech further states that Relator did not claim in this e-mail that Genentech had retaliated against him or wrongfully discharged him because of any protected conduct.  Genentech states that David Hooper responded to Relator's e-mail by letter dated May 5, 2005.   Genentech denies all other allegations in Paragraph 117.

118.     In response to the allegations in Paragraph 118, Genentech states that Relator never "report[ed] his knowledge of illegal promotions of Rituxan off-label treatments of RA by Genentech sales representatives to Rice [or] ask[ed] him to investigate and stop such practices." Genentech further states that it does not have knowledge of all of the indications Relator may have received regarding his job performance.  Genentech denies all other allegations in Paragraph 118.

119.    Genentech denies the allegations in Paragraph 119.  Answering further, Genentech incorporates by reference its responses to Paragraphs 27-34.

120.     In response to the allegations in Paragraph 120, Genentech states that Relator never raised any issue, complaint or concern with any of his supervisors at Genentech that Rituxan was being promoted for "off-label" use, or any other alleged illegal activity.  Genentech

further denies that Relator was engaged in any protected conduct under the False Claims Act.
Genentech is without information or knowledge sufficient to respond to the allegations regarding
the state of Relator's knowledge and experience, and therefore denies those allegations.

121.    Genentech denies the allegations in Paragraph 121, and incorporates by reference
its responses to the allegations in Paragraphs 113-114.  Answering further, Genentech states that
Relator never raised, "either explicitly or implicitly," with any of his supervisors at Genentech
"the issue of the submission and payment of ineligible claims to governmental medical
reimbursement systems such as Medicare or Medicaid for the off-label use of Rituxan to treat
RA."

122.    Genentech denies the allegations in Paragraph 122.

123.    In response to the allegations in Paragraph 123, Genentech incorporates by
reference its responses to all preceding paragraphs.

124.    Genentech denies the allegations in Paragraph 124.

125.    Genentech denies the allegations in Paragraph 125.

## **AFFIRMATIVE DEFENSES**

Genentech hereby states the following affirmative defenses, without assuming the burden
of proof of any defense, and reserves its right to assert additional defenses if and when they
become appropriate.

### First Affirmative Defense

This Court has dismissed Counts I and II from this action, and the Parties have jointly moved to dismiss those Counts from Relator's Corrected Second Amended Complaint. Thus, Genentech is not obligated to further defend itself against those Counts or the allegations in support thereof.

### Second Affirmative Defense

Counts III and IV of Relator's Corrected Second Amended Complaint fail to state a claim against Genentech upon which relief can be granted.

### Third Affirmative Defense

Relator's claims may be barred in whole or in part by the equitable doctrines of unclean hands, laches, waiver, and estoppel.

### Fourth Affirmative Defense

Relator failed to take reasonable steps to mitigate his damages.

### Fifth Affirmative Defense

Relator's claims for relief are barred because any actions actually taken by Genentech with respect to the subject matters alleged by Relator were undertaken in good faith, and constitute lawful, proper, justified and/or privileged conduct.

### Sixth Affirmative Defense

Relator's claims for relief are barred because any alleged conduct by Genentech relating to the promotion of pharmaceuticals is protected by the First Amendment of the United States Constitution.

### Seventh Affirmative Defense

Genentech's actions with respect to Relator's employment were made without malice, in good faith, and for legitimate, non-discriminatory business reasons.

### Eighth Affirmative Defense

Relator's relief, if any, is limited to amounts authorized by applicable law.

### Ninth Affirmative Defense

To the extent Genentech discovers during the course of this action that Relator engaged in any conduct that would warrant discharge under Company policy, Relator's right to recover damages beyond the date of such discovery will be cut off.

### Tenth Affirmative Defense

Any damages Plaintiff allegedly sustained were the result of acts performed, if at all, by individuals for whom Defendant is not vicariously liable under the doctrine of *respondeat superior*.

### Eleventh Affirmative Defense

Any damages Relator allegedly sustained were the result of acts performed, if at all, by individuals acting *ultra vires* and for which Defendant is not liable.

      **WHEREFORE,** Genentech prays that Counts III and IV of Relator's Corrected Second Amended Complaint be dismissed; that this action be dismissed in its entirety; that Relator take nothing; that Genentech be awarded attorneys' fees and its costs of suit; and that Genentech be granted such other and further relief as this Court may deem appropriate.

 Dated at Portland, Maine this 30th day of August, 2007.

                /s/  John H. Rich III
               John H. Rich III, Esq.
               Jennifer H. Pincus, Esq.
               Perkins Thompson Hinckley & Keddy
               One Canal Plaza, P.O. Box 426
               Portland, ME  04112-0426
               jrich@perkinsthompson.com
               jpincus@perkinsthompson.com

               Paul E. Kalb, Esq.
               Stephen C. Payne, Esq.
               Sidley Austin  LLP
               1501 K Street, NW
               Washington, DC  20005-1401
               PKalb@Sidley.com
               SPayne@Sidley.com

               Attorneys for Defendant Genentech, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2007, I electronically filed the foregoing Answer Of Genentech, Inc. To Relator's Corrected Second Amended Complaint and this Certificate of Service using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/  John H. Rich III

John H. Rich III, Esq.

Attorney for Defendant Genentech, Inc.

Perkins Thompson, P.A.
One Canal Plaza
P.O. Box 426
Portland, ME  04112-0426
(207) 774-2635
jrich@perkinsthompson.com

34

CH1 3975503v.6